# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARY J. CHAMBERS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No.2:07CV00036 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | Chief United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

*Joseph E. Wolfe, Wolfe, Williams & Rutherford, Norton, Virginia, for Plaintiff; Andrew C. Lynch, Special Assistant United States Attorney, Philadelphia, Pennsylvania, Michael McGaughran, Regional Chief Counsel, and Victor J. Pane, Assistant Regional Counsel, Region III, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

## I

Mary J. Chambers filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2007) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.*

The plaintiff applied for benefits on April 8, 2005 (R. at 46-63), alleging disability since June 1, 2002, due to diabetes, a back injury, and a tumor on her pituitary gland. (R. at 46.) Her claim was denied initially on May 24, 2005 (R. at 16), and upon reconsideration on July 21, 2005. (R. at 17, 24-26.)

On September 14, 2005, the plaintiff filed a timely written request for a hearing before an administrative law judge ("ALJ"). (R. at 27.) A hearing was held on July 31, 2006. (R. at 218-41.) The plaintiff, who was present and represented by counsel, testified at the hearing. (R. at 221-33.) Susan Bland, M.D., a medical expert, and Norman Hankins, Ph.D., a vocational expert, were also present and testified. (R. at 233-40.) By decision dated August 28, 2006, the ALJ found that the plaintiff was not disabled within the meaning of the Act. (R. at 10-15.) Although he found she

- 2 -

suffered from a combination of severe impairments of diabetes and obesity, he found she retained the residual functional capacity to return to her past relevant work.  (*Id.*)

The plaintiff next filed a request for review with the Social Security Administration's Appeals Council ("Appeals Council") on September 13, 2006.  (R. at 7.)  The Appeals Council denied review on May 21, 2007 (R. at 4-6), therefore the ALJ's opinion constitutes the final decision of the Commissioner.  The plaintiff has filed a complaint with this court objecting to the Commissioner's final decision.

Both parties have filed motions for summary judgment and have briefed the issues.  The case is ripe for decision.

II

The following facts are contained in the summary judgment record.  Mary Janis Chambers was born on June 25, 1953, and was fifty-three years old at the time the ALJ issued his opinion.  (R. at 43).  Although Chambers did not complete high school, she obtained her G.E.D. in 1987.[1]  (R. at 52.)  Throughout her adult life, she has worked in factories and been a custodian.  (R. at 47-48.)  Just prior to the onset

---

[1]  It should be noted, however, that at the hearing before the ALJ, the plaintiff testified that she had not obtained a G.E.D.  (R. at 221.)

Case 2:07-cv-00036-JPJ-PMS   Document 15   Filed 07/02/08   Page 3 of 25   Pageid#: 63

of her alleged disability, she worked as a machine operator at a sewing factory, earning $7.00 per hour. (R. at 47.)

The plaintiff has been treated for diabetes, back pain, a pituitary tumor, and obesity. The ALJ found that she was severely impaired by a combination of diabetes and obesity. He also found that there was no objective evidence of a musculoskeletal impairment that caused any more than a minimal effect on the plaintiff's ability to work. (R. at 12.) He made no findings with regard to her pituitary tumor.

A. Diabetes.

The plaintiff was diagnosed with Type-2 diabetes in February 2001. (R. at 145.) Her reported symptoms included feeling tired, lack of energy, excessive thirst, nocturnal voiding, and frequent urination. (*Id.*) Urinalysis revealed a large amount of glucose in her urine and a finger stick indicated that her blood sugar level was 334. (*Id.*) The plaintiff elected to treat her diabetes with dietary changes instead of medication. Nurse practitioner Carol A. Looney counseled the plaintiff about her diet and discussed, in detail, a treatment plan. (*Id.*)

Two weeks after the initial diagnosis, the plaintiff returned to see Faisal W. Chaudhry, M.D. At that time, her blood sugars were still elevated and her glycated hemoglobin was "extremely high." Dr. Chaudhry discussed the importance of a low sugar diet with the plaintiff and started her on Glucophage to treat her diabetes. (R.

- 4 -

at 144.)  The plaintiff denied having blurred vision, loss of consciousness, dysuria,[2] pyuria,[3] or hematuria.[4]  (*Id.*)

In March 2001, the plaintiff's blood sugar levels remained elevated.  Her doctor increased her dosage of Glucophage and prescribed Amaryl.  (R. at 142-43.) She reported mild blurry vision.  She was counseled to follow a low sugar diet.  On May 9, 2001, a glycated hemoglobin revealed improvement.  (R. at 139.)

On August 8, 2001, Dr. Chaudrhry noted that the plaintiff had recently begun hormone replacement therapy due to menopause and that the therapy was causing her blood sugars to spike.  He added Actos to her regimen of diabetes medications.  (R. at 137.)

On February 12, 2002, the plaintiff began seeing Brian Easton, M.D., of Highlands Family Medicine, for services related to her diabetes.  At that time, she was taking Glucophage and Amaryl to treat her diabetes and reported that her home blood glucose fasting readings had been averaging 150.  (R. at 175.)  On May 15,

---

[2] Dysuria is "painful or difficult urination, symptomatic of numerous conditions." *Taber's Cyclopedic Medical Dictionary* 629 (19th ed. 2001).

[3] Pyuria is "pus in the urine" and may be evidence of a renal disease or an infection somewhere in the urinary tract.  *Id.* at 1733.

[4] Hematuria is the presence of blood in the urine, which may be caused by a "variety of conditions, including contamination during menstruation or the puerperium; internal trauma or kidney stones; vigorous exercise; urinary tract infections or system infections with renal involvement; some cases of glomerulonephritis; vascular anomalies of the urinary tract; or cancers of the urethra, bladder, prostate, ureters, or kidneys."  *Id.* at 911.

2002, she returned to Dr. Easton. Her home blood glucose readings were still averaging 150 and she reported taking Glipizide, Glucophage, and Amaryl to treat her diabetes. (R. at 170.)

The plaintiff did not return to see Dr. Easton for a year. Sometime during that year, she had stopped monitoring her blood glucose levels at home but had continued to take Glucophage and Glipizide to treat her diabetes. (R. at 172.)

On May 15, 2004, the plaintiff saw Physician Assistant Rachel Gilmer at C-Health of Lebanon. Gilmer noted that the plaintiff had been compliant with her treatment, taking her medication as directed, maintaining her diet and exercise regimen, and following up as directed. (R. at 208.) The plaintiff had resumed monitoring her blood glucose levels at home and reported that they had been high, ranging from 180 to 200. (*Id.*) At a follow up visit five months later, the plaintiff denied "experiencing any diabetes related symptoms" and professed compliance with her medication, diet, and exercise regimen. (R. at 202.) Her home blood glucose readings remained high.

On June 29, 2005, and September 30, 2005, the patient again denied experiencing diabetes related symptoms and reported compliance with her medication, diet, and exercise regimen. (R. at 167, 164.)

The last document in the summary judgement record relating to the plaintiff's diabetes is dated November 28, 2005. At that time, the plaintiff told George Wagner, M.D., of Stone Mountain Health Services Haysi Clinic, that she did not watch her diet or check her blood glucose levels on a regular basis. (R. at 183.) Dr. Wagner advised her that she was taking the maximum level of medication permitted and that the next step would have to be insulin. The plaintiff stated she would try to lose ten pounds before returning the next month. (*Id.*)

There is no evidence in the record to indicate whether the plaintiff began insulin treatment or whether she resumed compliance with her diet, exercise, and home monitoring regimen.

## B. Obesity.

The ALJ also found that the plaintiff had a severe impairment of obesity. (R. at 12.)

The earliest notation of the plaintiff's weight in the summary judgement record is dated December 11, 1995. At that time, she weighed 157.5 pounds. (R. at 102.) Although her weight fluctuated over the ten years documented in the record, the overall trend was an increase in her weight. The most recent record indicates that the plaintiff weighed 213 pounds on January 17, 2006. (R. at 187.) She is sixty-three inches tall. (R. at 206.)

- 7 -

C. Musculoskeletal Impairment.

The plaintiff also complains of musculoskeletal impairment in the form of back pain. The ALJ rejected the plaintiff's claim of disability based on musculoskeletal impairment. (R. at 12.)

The plaintiff traces her back problems to an automobile accident on October 26, 1995. In the emergency room, after the accident, it was found that she had neck and back strain. (R. at 109.) X rays revealed no acute disease. The plaintiff met with Larry G. Mitchell, M.D., to follow up on her neck and back strain a couple days later. (*Id.*) Dr. Mitchell's physical examination revealed tenderness and spasm in the posterior cervical muscle. Range of motion in her neck was "almost normal but with pain at the extremes of flexion and extension." (*Id.*) Examination of her back revealed "tenderness in the paralumbar muscles bilaterally" with "some bruising in the midline of the low back." (*Id.*) Her range of motion in her back was limited on forward flexion. Dr. Mitchell continued her prescription of Naprosyn to treat her pain.[5] He prescribed physical therapy for her back and neck and advised her to stay home from work that week. (*Id.*)

The plaintiff began physical therapy the next day. Physical Therapist Timothy Trent assessed the plaintiff with having "cervical hypomobility with hypersensitive

_____

[5] Presumably the physicians in the emergency room had prescribed her Naprosyn for pain.

trigger points and increased muscle tone in the right subcranial and left trapezius levator muscle groups." (R. at 108.)  Trent also noted that she had a bruise that was tender to palpation in her lower lumbar and upper sacral region.  He recommended moist heat for her "lower back and cervical and upper thoracic regions, to be followed by electrical stimulation and ultrasound progressing to passive stretching range of motion exercises[,] as tolerated for the lumbar and cervical regions."  (*Id.*)  The plaintiff continued with physical therapy until December 11, 1995.  (R. at 110-11.)

On November 13, 1995, the plaintiff followed up with Dr. Mitchell about her back pain.  She reported "a lot of pain in her coccygeal area, along with some aches and pains in her back and neck."  (R. at 104.)  The plaintiff had not returned to work and was unable to do her housework.  She reported some improvement, in that her movements were less painful.  Examination of her neck and upper extremities revealed that she had free range of motion and no tenderness.  Palpation of the back revealed tenderness around the sacrococcygeal junction and in her low back muscles.  Although her range of motion in her low back was slightly limited, she had free range of motion in her lower extremities.  Dr. Mitchell recommended she continue physical therapy, continue taking Naprosyn for pain, and follow up in one week to determine whether she would be able to return to work.  (R. at 105.)

- 9 -

One week later, she continued to complain of pain in her neck, back, and coccygeal area and explained that the Naprosyn did not completely relieve her pain symptoms. (R. at 103.) Physical examination of her neck and upper extremities revealed free range of motion with no tenderness. However, her low back muscles and sacral coccygeal junction were tender to palpation and there were spasms in her mid back muscles. Dr. Mitchell advised her to continue with physical therapy and prescribed Ultram, in addition to Naprosyn, for her pain.

On December 11, 1995, the plaintiff reported that her symptoms were getting worse. (R. at 102.) She complained of pain in her hips and coccygeal area with intermittent numbness in her left leg. Dr. Mitchell's physical examination revealed some tenderness and limited range of motion in her neck along with tenderness in her low back muscles and near the sacrococcygeal junction. He referred her for neurosurgical evaluation. (*Id.*)

On December 27, 1995, the plaintiff visited Travis Burt, M.D., at Bristol Neurological Associates, P.C. (R. at 119-20.) At that time, her primary complaint was pain in her lower lumbosacral area and primary sacral. Her thoracic pain was located between her shoulder blades and paraspinous in nature. Dr. Burt noted that she had full range of motion in her lumbar spine "without demonstrable scoliosis or exacerbation of her pain." (R. at 119.) The plaintiff also had full range of motion in

side bends in her thoracic spine and in her cervical spine without pain. (R. at 119-20.) Neurological examination proved unremarkable. Dr. Burt suggested the plaintiff might have "myofacial syndrome secondary to a whiplash type injury." (R. at 120.) After reviewing the films she brought to the examination, he noted that her cervical spine appeared normal but she demonstrated "a spina bifida occulta, with a transitional vertebra in the lumbar spine." He recommended new films be taken of her spine, with flexion/extension views of her cervical and lumbar spine. He ordered a rheumatology workup and suggested a bone scan to rule out inflammatory or neoplastic causes of the plaintiff's pain. (R. at 120.)

On January 4, 1996, the plaintiff went to Bristol Regional Medical Center for spinal films, a rheumatology workup, and a bone scan. (R. at 125-36.) Upon reviewing the results, Dr. Burt concluded that the lumbar, thoracic, and cervical spines were normal and that the rheumatology workup was also normal. (R. at 118.) He recommended that she be evaluated by Southeastern Pain Management Center.

On January 31, 1996, the plaintiff followed up with Dr. Mitchell who also recommended that she be evaluated by Southeastern Pain Management Center. (R. at 107.) At the time of the visit, she was tender to palpation near her sacrococcygeal junction.

Instead of going to be evaluated and treated by the Southeastern Pain Management Center, as she had been advised, the plaintiff elected to see Dr. Gregory, a chiropractor. (R. at 106.) On March 2, 1996, she told Dr. Mitchell that she was having less pain in her lower back and legs but continued to have some pain in her mid back and neck. (*Id.*) His examination revealed tenderness in her neck, upper back, mid back, and lower back. Dr. Mitchell encouraged her to continue with chiropractic treatment and follow up with him after she completed that treatment.

On May 13, 1996, the plaintiff visited Dr. Mitchell and reported that she continued to receive chiropractic treatment and that her condition was improving. (R. at 101.) She had resumed her chores at home but they took her longer to complete than before her accident. Physical examination revealed spasm in the posterior cervical muscles and some tenderness in her upper back and trapezius muscles. She had some limitation in her range of motion in her thoracic spine but had improved since her last visit. Finally, she had free range of motion in her upper and lower extremities. (*Id.*) Dr. Mitchell urged her to continue chiropractic treatment and refilled her Ultram and Naprosyn prescriptions. The plaintiff followed up with Dr. Mitchell a month later and reported gradual improvement from her chiropractic treatment. Dr. Mitchell observed that her range of motion in her thoracic spine was almost back to normal. (R. at 100.)

- 12 -

On July 12, 1996, the plaintiff told Dr. Mitchell that her chiropractor had encouraged her to become more active and return to work. (R. at 99.) The plaintiff, however, claimed that increased activity caused her neck and back to hurt. She was interested in undergoing rehabilitation, instead. Dr. Mitchell suggested the plaintiff enter a work hardening program. It is unclear from the record whether the plaintiff ever followed up on this suggestion.

In October and November 1996, Dr. Mitchell again met with the plaintiff. At that time, she reported some dizziness and blurred vision. (R. at 93-94.) Dr. Mitchell was uncertain whether these new symptoms were caused by her automobile accident or her newly discovered pituitary tumor. He recommended she consult Dr. Burt about her tumor and neck and back pain. (R. at 93.) In February 1997, the plaintiff returned to Dr. Mitchell and reported "persistent pain in the low left back area" which had begun to radiate from her groin area to her left knee. (R. at 92.) She complained of pain and numbness which were exacerbated by walking for as little as fifteen minutes or extensive standing. Physical examination revealed some tenderness in her neck with palpation and rotation. Her left low back muscles were also tender to palpation. Dr. Mitchell suggested she resume treatment at the Appalachian Wellness Center and prescribed Robaxin.

- 13 -

On March 8, 1997, the plaintiff reported continued neck and back pain but said that her back was feeling better. (R. at 90.) Dr. Mitchell noted that there was "a little tenderness to palpation in the posterior cervical muscles." He told her to continue treatment at Appalachian Wellness Center until she achieved maximum medical benefit and to continue with her medications. (R. at 91.) On May 31, 1997, Dr. Mitchell observed that her "neck and back injury secondary to motor vehicle accident [was] resolving." (R. at 86.) The plaintiff professed to feel better and a physical examination revealed no tenderness in the cervical spine and almost normal range of motion in her neck. She had free range of motion in her upper extremities and no tenderness in her back. (*Id.*) In August 1997, the plaintiff told Dr. Mitchell that she was getting progressively better but that she still had pain in her low back and left leg. (R. at 84.) Physical examination revealed tenderness to palpation in her low back and in the midline of her lower lumbar spine. She had free range of motion in her lower extremities. Dr. Mitchell advised her to continue with exercise at home and to continue taking Naprosyn and Flexeril. (*Id.*)

On September 22, 1997, the plaintiff followed up with Dr. Mitchell about her back pain. She reported that her back was better but that she still had occasional pain. She had also developed pain in her shoulders, wrists, and left leg which worsened with rainy and cold weather, causing her to believe she had developed arthritis. (R.

- 14 -

at 82.)  Dr. Mitchell, noting a probable diagnosis of early osteoarthritis, changed her medication to Daypro.  He encouraged her to continue with her chiropractic treatment so long as she needed it.  (*Id.*)

Two months later, the plaintiff reported that she developed pain in her left low back and hip after working around the house six days prior.  (R. at 80.)  The pain had gradually decreased since that time.  Dr. Mitchell switched her pain medication back to Naprosyn because the plaintiff said it was more effective than Daypro.  (*Id.*)  In March 1998, the plaintiff reported improvement without complete resolution of her back pain.  (R. at 79.)  Physical examination revealed only a little tenderness in her left paralumbar muscles.  Dr. Mitchell recommended she continue with her chiropractic treatment and medications and offered to help her assess employment opportunities.  (*Id.*)

Three months later, the plaintiff reported increased pain in her low back.  (R. at 77.)  Dr. Mitchell's examination revealed "tenderness to palpation and perhaps slight swelling over the sacroiliac areas."  (*Id.*)  She had limited range of motion in her low back.  Because the plaintiff reported past success with massage therapy, Dr. Mitchell encouraged her to try that again and to continue taking Naprosyn.

The record is silent with regard to the plaintiff's back complaints until April 2000.  At that time, the plaintiff advised Carol A. Looney, CS, FNP, that she had

- 15 -

"occasional flare ups" of pain stemming from a motor vehicle accident in 1995 and that she had been taking Relafen. (R. at 151.) The plaintiff complained of low back, neck, and right wrist pain and examination revealed tenderness with palpation of the cervical and lumbosacral spine. Looney refilled the plaintiff's Relafen prescription and advised her to use a heating pad and to avoid bending, lifting, and pulling. In August 2000, the plaintiff complained of low back pain and muscle spasms caused by some heavy lifting. (R. at 148.) She was prescribed Arthrotec and Flexeril.

There are no further complaints of back pain until May 12, 2003, when the plaintiff, at an appointment related to her diabetes, reported intermittent moderate pain in the thoracic region that was alleviated by Naprosyn. (R. at 172.) Dr. Easton noted some left thoracic paraspinal tenderness and refilled her Naprosyn prescription. (R. at 173.)

In June 2005, the plaintiff complained of lumbar pain, which she said had worsened since her last visit and that she was essentially in "constant pain." (R. at 167.) She dated the pain to her motor vehicle accident in 1995. Physician Assistant Rachel Gilmer recommended she consider having an epidural and advised the plaintiff to take muscle relaxants and to take Naprosyn every day. Gilmer prescribed Baciofen and Butalbital. (R. at 169.) Three months later, the plaintiff reported that in addition to the lumbar pain, she had begun experiencing numbness in her right

- 16 -

hand. (R. at 164.) She had not been taking the Baclofen, as prescribed. Musculoskeletal examination proved normal. (R. at 165.) Dr. Easton instructed her to take only Baclofen for pain. (R. at 166.)

On November 28, 2005, George Wagner, M.D., notes that the plaintiff "has been disabled by pain in the back since auto accident sometime ago" and that she "has not been able to lift a while since that time." (R. at 184.) He noted that she was not currently receiving treatment for her back because of financial problems. He diagnosed her with back pain and advised her to continue using heat to treat her back pain. At a future visit, he planned to do an S-spine X ray to determine whether the plaintiff had a "chronic loss of disc space or a compression fracture," which he believed was more likely. (*Id.*)

There are no further records relating to the plaintiff's back pain.

### D. Pituitary Tumor.

The plaintiff also complains of a pituitary tumor. On August 20, 1996, the plaintiff saw Dr. Burt, complaining of dizziness, and he ordered an MRI of her brain. (R. at 117.) The plaintiff had an MRI at Bristol Regional Medical Center on August 28, 1996, which revealed a prominence of the pituitary. (R. at 124.) Later coronal images revealed a "small soft tissue density to the left of the midline arising from the

- 17 -

superior portion of the pituitary adjacent to but apparently not displacing the pituitary stalk." (R. at 122-23.)

On October 17, 1996, Dr. Mitchell told the plaintiff (and the attorney who represented her in connection with her automobile accident), that the CT revealed a possible pituitary tumor and that further evaluation was necessary. (R. at 94.) In November, Dr. Mitchell planned to follow up with Dr. Burt regarding the pituitary lesion and develop any treatment plan based on his recommendation. (R. at 93.)

On August 1, 1997, the plaintiff had another MRI. It was the radiologist's opinion that the pituitary lesion was unchanged from the previous year. (R. at 83.)

Finally, on November 28, 2005, there is a note from Dr. Wagner stating that the plaintiff told him she had a "benign pituitary tumor" which she had not had evaluated recently "due to lack of funds." (R. at 183.) There are no further records pertaining to the pituitary tumor in the summary judgment record.

Based upon the above recited evidence and the testimony of experts Dr. Bland and Dr. Hankins, the ALJ determined that the plaintiff suffers from the severe impairments of diabetes and obesity, only, and that she is able to return to her past relevant work. (R. at 10-15.)

- 18 -

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The plaintiff must show that her "physical . . . impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C.A. § 423(d)(2)(A).

The ALJ applies a five-step sequential process in evaluating a claim for DIB. The ALJ must decide whether the plaintiff (1) has worked during her alleged period of disability; (2) has a severe impairment or combination of impairments; (3) has an impairment or combination of impairments that meets or equals the severity of a listed impairment; (4) can resume past relevant work; and, if not, (5) can perform other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4) (2007). If the ALJ finds that the claimant has failed to meet any step of the process, then the inquiry immediately ceases. *See id.; Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987).

My review is limited to whether there was substantial evidence to support the ALJ's final decision and whether the ALJ applied the correct legal standard. 42 U.S.C.A. §405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). If the ALJ's decision is supported by substantial evidence, then I must affirm the final

- 19 -

decision. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotations omitted). Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 642. The ALJ properly resolved evidentiary conflicts, including inconsistencies in the evidence. This court may not substitute its judgment for that of the ALJ, so long as substantial evidence supports the ALJ's decision. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff makes two arguments, both based on a lack of substantial evidence. First, the plaintiff contends that there was not substantial evidence to support the ALJ's determination that the plaintiff was able to perform at least the full range of medium exertional activity. (Pl.'s Br. Supp. Mot. Summ. J. at 18-19.) Second, the plaintiff contends that there was not substantial evidence to support the ALJ's determination that the plaintiff can perform her past relevant work. (Pl.'s Br. Supp. Mot. Summ. J. at 19-20.) I will address each argument separately.

A.  Residual Functional Capacity.

The plaintiff argues that the ALJ's finding that she retains sufficient residual functional capacity to return to medium exertional work is not supported by substantial evidence because that decision was based on the ALJ's erroneous

conclusion that the plaintiff did not suffer from a musculoskeletal impairment severe enough to more than minimally impact her ability to work.

The ALJ briefly explained that he rejected the plaintiff's contention that she suffered from a severe musculoskeletal impairment because the record was devoid of objective evidence to support that contention. (R. at 13.) My careful review of the summary judgment record has led me to decide that the ALJ's conclusion is supported by substantial evidence.

The plaintiff's back pain began after a motor vehicle accident in 1995. (R. at 109.) Her pain, which was located in her neck, mid-back, and low back, continued to plague her for a few years. (R. at 77, 79-80, 89-94, 99-107, 118-20.) During that time, she visited a physical therapist. (R. at 108, 110-11). She also took pain medication on a regular basis. (R. at 77, 80, 82, 84, 92, 101, 103, 105, 109.) She told her doctors that the medication alleviated, although it did not completely relieve, her pain. (R. at 77, 80, 82, 103). The plaintiff's comments to her doctors over the years indicate that she received substantial benefit from chiropractic care, and she was encouraged to continue with that type of treatment. (R. at 79, 99-101, 106.)

Between 1995 and 1998—when the plaintiff was regularly seeing doctors for her back pain—she underwent several X rays (R. at 109, 131-35), a bone scan (R. at 136), and a rheumatology work up (R. at 125-30), to discover the source of her pain.

- 21 -

Films taken at the emergency room immediately after her car accident revealed "spina bifida occulta and no acute disease." (R. at 109.) The same condition was noted on X rays taken at the request of Dr. Burt a few months later. (R. at 132.) Otherwise, the films were only notable for mild degenerative changes to her thoracic spine. (R. at 131.) The rheumatology work up was normal (R. at 118) and the bone scan was normal. (R. at 136.) The plaintiff was also evaluated by a neurological specialist, and he concluded there was no neurologic deficit. (R. at 118.)

The plaintiff has submitted no records pertaining to her back pain from June 1998 to April 2000. In April 2000, the plaintiff described her back pain as consisting of "occasional flare ups." (R. at 151.) Two months later, the plaintiff sought treatment for a flare up brought upon by some heavy lifting. (R. at 148.)

The plaintiff last met the insured status requirements of the Social Security Act on September 30, 2003. On May 12, 2003—the last doctor's visit wherein the plaintiff complained of back pain prior to expiration of her insured status—the plaintiff reported intermittent moderate pain in her thoracic area that was responsive to Naprosyn. (R. at 172.)

At the hearing before the ALJ, Dr. Bland testified that her review of the plaintiff's medical records indicated that examinations of the plaintiff's back had "been basically benign without any objective evidence of radiculopathy." (R. at 234.)

- 22 -

Dr. Bland indicated that any limitations imposed by the back pain would be based on the plaintiff's subjective complaints of pain rather than any objective evidence. (R. at 235.)

I find that there is substantial evidence in the administrative record to support the ALJ's determination that the plaintiff does not suffer from a musculoskeletal impairment severe enough to more than minimally impact her ability to work. Although the plaintiff experienced chronic back pain in the two years after her car accident, her condition improved. In later years, she describes it to doctors as intermittent and exacerbated by heavy lifting. At the hearing before the ALJ, the plaintiff testified that she had had "back pain night and day" since her accident in 1995 (R. at 227), and that she was limited in her daily activities by the pain she experienced. (R. at 228-33.) The plaintiff, however, has offered no objective evidence to support her allegations, and the allegations are contradicted by the medical records she did submit.

Having found that the ALJ's decision regarding musculoskeletal impairment was supported by substantial evidence, I next turn to his determination that the plaintiff retained the residual functional capacity to perform medium exertional work.

The ALJ found that the plaintiff suffered from two severe impairments—obesity and diabetes—yet retained the ability to perform a full range

- 23 -

of medium exertional work.  In so concluding, the ALJ credited the plaintiff's claims that her diabetes caused her to feel fatigued and weak and that her obesity restricted her mobility.  (R. at 13-14.)  Nonetheless, he found that she retained the ability to perform medium exertional work, which involves lifting items weighing up to fifty pounds at a time with frequent lifting of items weighing up to twenty-five pounds. *See* 20 C.F.R. § 404.1567(c) (2007).  The only objective evidence to the contrary was a Diabetes Mellitus Residual Functional Capacity Questionnaire completed by Dwight Bailey, M.D., on July 28, 2006.  (R. at 177-80.)  The ALJ explained that he did not credit the Questionnaire because Dr. Bailey only saw the plaintiff on one occasion and completed the Questionnaire almost three years after the plaintiff last met the insured requirements of the Social Security Act.  (R. at 14.)

Because the ALJ's decision was supported by substantial evidence, I will not disturb it.

### B.  Past Relevant Work.

The plaintiff's second argument is that substantial evidence does not support the ALJ's determination that the plaintiff retains the ability to return to her past relevant work.

The plaintiff's past relevant work consists of factory work and custodial work. (R. at 47-48.)  At the hearing before the ALJ, the plaintiff described the tasks and

- 24 -

physical demands associated with those jobs.  Specifically, she testified that at the sewing factory, her last job, she lifted bundles of clothing weighing up to twenty-five pounds.  (R. at 222.)  She last worked at her custodial job in 1995, seven years before she alleges disability commenced.  (R. at 47.)  At that job, she was required to lift up to 40-pound containers of trash.  (R. at 223-24.)  Dr. Hankins, the vocational expert, testified that the plaintiff's prior custodial work required medium exertion and her prior sewing factory work required light exertion.  (R. at 237.)

Because there was substantial evidence to support the ALJ's determination that the plaintiff could engage in medium exertional work and because her past relevant work was categorized as medium or light, then the plaintiff has the residual functional capacity to return to her past relevant work.


IV

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted, and the plaintiff's motion for summary judgment will be denied.

An appropriate final judgment will be entered.

DATED: July 2, 2008

 /s/ JAMES P. JONES
Chief United States District Judge